BLAND DRILLING CO., Inc., sometimes known as Bland Drilling Company, a Wyoming corporation, Appellant (Plaintiff below),

v.

AMERICAN INDUSTRIES, INC., a Nevada corporation, Dunham Price, Inc., a Louisiana corporation, Star Oil, Inc., a Montana corporation, Ted F. Dunham, also known as Ted F. Dunham, Sr., Anderson Dunham, Inc., a Louisiana corporation, J. F. Mahoney, Robert J. Murphy, and Eugene Stevens, Appellees (Defendants below).

No. 3599.

Supreme Court of Wyoming.

Jan. 9, 1968.

George M. Porter, Houston G. Williams, Wehrli & Williams, Casper, for appellant.

Joseph Cardine, Casper, and Alloway, Loye & Bangert, Denver, for appellee, American Industries, Inc.

William T. Schwartz, Casper, and Cooke, Moulton, Bellingham, Longo & Mather, Billings, Mont., for appellees, Dunham Price, Inc., Star Oil, Inc., Ted F. Dunham, and Anderson Dunham, Inc.

Lawrence E. Middaugh, Casper, for appellees, J. F. Mahoney and Robert J. Murphy.

Eugene Stevens, pro se.

Before HARNSBERGER, C. J., and GRAY, McINTYRE, and PARKER, JJ.

Mr. Justice PARKER delivered the opinion of the court.

Plaintiff on October 9, 1964, brought a quiet title action covering an undivided one-half interest in a federal oil and gas lease in Natrona County and additionally sought $500,000 damages for being forcibly ejected and kept off the land. In discussion of the case, plaintiff will be referred to as Bland company, Ed Bland as Bland, American Industries, Inc., as American, Dunham Price, Inc., Star Oil, Inc., Ted F. Dunham (Ted F. Dunham, Sr.), and Anderson Dunham, Inc., will be referred to as the Dunham group, and the remaining defendants by their last names, Mahoney, Murphy, and Stevens.

In essence, plaintiff alleged in its complaint a farmout by which the Bland company and Bland agreed with American, which warranted itself as owner of 100 percent leasehold rights in the described property, to drill five exploratory wells in return for an assignment of an undivided 50 percent working interest in that portion of the Tensleep formation underlying lands and leasehold described in the farmout; that, upon completion to production or abandonment of the first five wells, plaintiff under the farmout was granted an option to drill an addditional five wells on the leased property, and upon completion thereof would be entitled to an assignment from American of an undivided 50 percent of its remaining 100 percent working interest in the lcasehold without limitation as to depth or zone; that plaintiff drilled the first five wells in compliance with the farmout and within the period of the option notified American of its election to drill the five additional wells but that American in collusion with the Dunham group forcibly ejected plaintiff and removed its drilling equipment from the lease and lands, denying right to enter thereon; that Bland himself neither claimed nor acquired any interest in the farmout or rights to be earned thereunder; that plaintiff had at all times been willing to comply with the agreement but that American had unlawfully refused to assign the interest specified by the farmout, and American with the Dunham group was illegally taking the oil from the wells drilled by plaintiff. Plaintiff further alleged that Mahoney, Murphy, and Stevens without basis claimed some right in the property adverse to plaintiff.

On October 29, 1964, the cause was removed to the Federal District Court of Wyoming at the instance of defendants (American had instituted an action in the Federal District Court of Colorado on September 23, 1964, against Bland, the Bland company, Debco, Inc., and the Dunham group), remained there some time, but was remanded January 14, 1965. Prior to the time of the removal, Stevens, Mahoney, and Murphy had filed answers but the other defendants had filed no pleadings. While the case was in federal court both the Dunham group and American filed motions to dismiss for failure to state a claim and because of lack of jurisdiction. Following the remand, Ted F. Dunham filed a motion to dismiss February 12, 1965; the court on April 29, 1965, gave notice that the "motions" to dismiss would be heard July 2, 1965; and the following day, April 30, motion for default was filed by plaintiff. Upon hearing, this motion was denied and American and the Dunham group given until June 1, 1965, to answer. Following their timely filing of separate answers and counterclaims, denying generally and seeking damages, a lengthy trial to the court ensued and judgment was entered decreeing that the parties have the following interests in the litigated lease: American, one-half; the Dunham group, three-eighths; Stevens, one-fortieth; Bland company, one-tenth (the Bland company portion being subject to the burden of 1 percent carried working interest for Murphy and Mahoney), all subject to the farmout agreement of February 29, 1964, operating agreement of the same date between American and Bland and "Ed Bland Drilling Company," a supplemental agreement to the farmout dated April 20, 1964, and an agreement of May 26, 1964.

The litigation developed certain disagreements between the parties both as to factual situations and legal results, but in general the occurrences which were the background of the controversy were:

Prior to 1963 Bland had been an oil driller employed at different times by Tipps, the majority stockholder in the Tipps Drilling Company, who with Tempel had owned a drilling rig and certain other equipment. Tipps' ill health and Bland's interest in gainful, oil-field activity were motivating factors for the establishment of the Bland company in July 1963, the stock of which was owned one-third each by Bland, Tipps, and Tempel, Bland being designated as president and general manager, and his wife as secretary-treasurer. Tipps and Tempel paid for their stock by certain letters of credit. For his stock, Bland paid $500 down and was to pay the balance due in monthly $500 payments out of his company wages. It was undisputed that Bland had an option to purchase Tipps' and Tempel's stock within one year for the amount they had in it. On February 29, 1964, an agreement was entered into between American and Bland and the Bland company, Bland signing twice, and it being designated in the body of the instrument that "Bland" as used therein would mean Ed Bland and Bland Drilling Company. Subsequent to the agreement, Bland had problems in financing the work contemplated by the farmout and confided this to an acquaintance, Stevens, who contacted Dunham. Negotiations ensued between Bland and the Dunham group, represented principally by one Nichols, resulting in the April 20, 1964, supplemental agreement.[1] This supplement made changes in the farmout, certain of which were to be effective only if Ted F. Dunham should by his acceptance of the letter become a joint participant with "Bland," apparently adopting the designation of the

1. The agreement was in the form of a letter to "Ed Bland, P. O. Box 1153, Casper, Wyoming" and "Bland Drilling Company, P. O. Box 1153, Casper, Wyoming," from American and commenced, "At a conference Saturday, April 18, 1964, attended by Ed Bland, your representative"; at the bottom of the letter, "Accepted and Approved," was typed three times, and respectively blanks were provided for "Ed Bland," "Bland Drilling Company," and "Ted F. Dunham." From the acknowledgment, the signatures were apparently placed thereon June 15, 1964.

farmout, and granting permission to "Bland" to assign part or all its interests in the farmout to Ted F. Dunham should the latter assume sole or joint obligation with "Bland" under the farmout.

On May 4, Debco, Inc., had been incorporated by lawyers Murphy and Mahoney, who were the directors, but on May 6 they resigned, and Bland and his wife were elected directors with his being president and treasurer and her vice-president and secretary. On May 26, 1964, Bland and Debco entered into an agreement with the Dunham group by which that group was to finance all drilling and development work provided for in the farmout, as modified by the supplemental agreement, all interests earned under the farmout to be owned one-fourth by "Bland" and three-fourths by the Dunham group. According to the May 26 instrument, "Bland has entered into a farmout agreement dated February 29, 1964, with American Industries, Inc. (the original farmout agreement ran to Ed Bland and Bland Drilling Company, a corporation, but the said agreement either has or will be modified so as to run in favor of D. E. Bland and Debco Inc.)."

In July Bland contacted Tipps to determine whether or not he could still exercise his option to purchase Tipps' and Tempel's interest in the Bland company. At about the same time Tipps learned of Bland's interest in the lease in question here, and on August 3, 1964, he examined the farmout agreement in American's offices. As a consequence of purported derelictions on the part of Bland, he and his wife were removed from the board of the Bland company on August 17, 1964, and Tipps, Tempel and their attorney were elected as the new directors. Subsequently Tipps was elected president, Tempel secretary-treasurer. Bland was retained as general manager for the purpose of winding up the business of the corporation, etc. On September 16, 1964, Bland, his wife, and Debco executed a disclaimer to any and all right, title, or interest they claimed in the lease. The previous day Tipps on behalf of the Bland company wrote to American formally exercising its option to drill the next five wells on or before September 23, 1964. However, American did not allow this, stating in a September 18, 1964, letter to the Bland company that it had not fulfilled the requirements or obligations of the farmout, and the work was accomplished by a driller selected by the Dunham group.

In this appeal, plaintiff argues that the decision of the trial court should be reversed and judgment should be ordered in its favor because:

1. American and the Dunham group were in default.

2. Bland's assignments to third parties were ineffective.

3. The May 26, 1964, agreement was ultra vires, illegal, and void.

4. American waived its right to insist upon the financial prerequisites of the farmout agreement.

5. The dealings by Bland in derogation of the rights of the stockholders of the Bland company, and in particular, the transaction involving Debco, are ineffective and void and vested no interest whatever in the Dunham group or the individual defendants.

6. No one dealing with Bland was entitled to rely upon his representations as to his authority as to the ownership of Debco or as to an assignment which was actually never made.

7. While the Bland company through actions of the stockholders ratified the original farmout agreement, proper action was promptly taken to repudiate the subsequent contracts involving the Dunham group and the individual defendants.

8. The assignments from American to the Dunham group were out of the interest of American and not out of the interest of the Bland company.

9. Both American and the Dunham group unlawfully excluded plaintiff from the leasehold and from the performance of

the farmout, and the Dunham group had no right whatever to enter upon the leasehold and complete the last five wells.

10. The assignments to Stevens, Murphy, and Mahoney were ineffective as being ultra vires, not approved by the corporation as required by statute, and not supported by adequate consideration. Furthermore, the Stevens assignment is void for indefiniteness.

### Default

Plaintiff urges that under the 1948 Act, Title 28, U.S.C.A. § 1446, removal to the federal court is automatic upon petition therefor, that the state's powers are tolled and suspended during the removal, that immediately upon the remand a cause returns to the state court in the same position as on the day of removal, and that the motions of the parties in federal court are not to be considered by the state court so as to relieve from default.

■ From our previous delineation of the filings herein, it will be apparent that should we adopt plaintiff's philosophy of the filing requirements in situations where there is removal and a subsequent remand and construe Rule 12, W.R.C.P., rigidly both American and the Dunham group would have been in technical default prior to the time that plaintiff attempted to take advantage of the situation. Nevertheless, the authorities cited by counsel do not go so far as to hold that under like circumstances the entering of a default is proper, let alone mandatory. Moreover, plaintiff overlooks the well established rule that the issuance of a default judgment is within the discretion of the trial court. In Westring v. Cheyenne National Bank, Wyo., 393 P.2d 119, 122, we said that judgments by default are not favored, courts preferring that cases be tried upon the merits, and quoted with approval 1 Freeman on Judgments, p. 580 (5 ed.): It is generally recognized that the discretionary power of the court should be liberally exercised in furtherance of justice, to the end that cases may be disposed of upon their merits rather than upon technicalities or fortuitous circumstances. In the instant litigation, the trial court was well aware that the parties had been attempting in their various ways to present to the proper authority their legal problems, both American and the Dunham group having challenged jurisdiction because of another action allegedly involving the same issues in the Colorado federal district court. Accordingly, we find no basis here present to convince us that the trial court abused its discretion in overruling plaintiff's motion for default.

### Bland's Assignments

■ Plaintiff argues that despite the statement on the face of the farmout saying it was between American and "Ed Bland and Bland Drilling Company, a Wyoming corporation," Bland was not a party, had no interest, and he did not sign as an individual but wrote the word "president" in his own handwriting under his signature. Counsel also point out the lack of any acknowledgment of Bland as an individual and further the testimony of Loeffler, American's attorney, that Bland was named as a party only as a guarantor. This argument is not convincing. In the first place, some weight must be given to the fact that the parties specifically allude to Bland as one of the parties on the face of the instrument. As to the word "president" in handwriting under Bland's signature, he denies having placed it there; we find nothing in the record indicating to the contrary; and at least to the untrained eye it does not appear to be in his handwriting. No authority is presented tending to hold that the agreement would be invalid as between the parties for lack of Bland's acknowledgment.

Plaintiff maintains that the April 20 agreement was not one to which the Dunham group was a party or which that group could enforce but was merely an amendment of the farmout and, in addition, a grant of authority from American to assign a portion of the contract to the Dunham group without the necessity of seeking consent to the specific agreement after

it had been negotiated. We do not disagree with this statement, but we do not see that it affects any interest which Bland may have personally had in the farmout, as supplemented by the April 20 agreement.

### Validity of the May 26, 1964, Agreement

■ Perhaps the most significant instrument in the controversy is the agreement of May 26 between "D. E. BLAND and DEBCO, INC. * * * referred to as 'Bland' " and the Dunham group, in which it was stated, inter alia, "Bland has entered into a farmout agreement dated February 29, 1964, with American Industries, Inc. (the original farmout agreement ran to Ed Bland and Bland Drilling Company, a corporation, but the said agreement either has or will be modified so as to run in favor of D. E. Bland and Debco, Inc.),"  under which "Bland" had a right to earn certain interests therein described, and in the contractual part provided that the Dunham group agreed to finance all the drilling and development work under the terms of the farmout and should be entitled to receive all of the net production proceeds from the lands which "Bland" under the terms of the farmout agreement would have been entitled to receive until the Dunham group should receive its investment in full, and agreed that the eventual interest in the leasehold would be American one-half, Bland (D. E. Bland and Debco), one-eighth, and the Dunham group three-eighths.

Plaintiff insists that Debco and Bland (an individual) had no interest in the farmout and that accordingly the Dunham group could secure no title. We have already referred to the situation regarding Bland's personal interest. The record is not entirely clear as to any interest which Debco had in the farmout. Murphy, Bland's attorney, testified that he had prepared an assignment of the farmout from the Bland company to Debco and he thought it was on the date which was reflected in his ledger of accounts, that he believed he had delivered it to American's office, but he had looked for it and could not find it. Officials of American said that they had searched and could not find an assignment. However, on July 16, 1964, in response to a letter from Bland, American approved assignment to Debco, stating that it was assumed Debco was wholly owned by Ed Bland and/or Bland Drilling Company. Bland testified that he assigned the American farmout to Debco around May 9, 1964, but also said that he did not have a copy of the assignment. He explained that he had done this because he wanted to have the drilling and production departments in separate companies. Minutes of Debco for May 6, 1964, recited:

> "Mr. Bland * * * stated that he and his wife, through their joint efforts, have obtained a Farmout Agreement from American Industries, Inc. covering certain lands in Natrona County, Wyoming. Mr. Bland stated that he felt that the lands covered were particularly amenable for oil and gas drilling and he felt that a drilling program would be successful. Bland stated that he and his wife would be willing to assign the farmout agreement to the company in exchange for 250 shares of the common capital stock of the company. Whereupon, after discussion, a motion was duly made, seconded and unanimously carried that the offer of Mr. Bland and his wife be accepted and that the assignment of the Farmout Agreement to the company be effected as of the date of this meeting and appropriate certificate of stock be exchanged therefore [sic]."

Plaintiff insists that if the assignment had actually been made the early part of May Bland would have remembered it at the time of the May 26 agreement and there would have been no necessity for the parenthetical statement concerning the modification of the farmout. Because of its speculative nature, we are doubtful that any weight can be given this argument. Additionally, it would be quite understandable that a man engaged in as many projects as Bland might not remember whether he had or had not executed an instru-

ment he believed his attorney to have previously drawn. Plaintiff further points out that there was no attempt to establish the assignment as a lost instrument and says this could not have been accomplished in an ancillary action, and further, that courts will not establish a lost instrument, even when its existence is proved, if to do so would be to validate an otherwise invalid instrument, citing 54 C.J.S. Lost Instruments § 8. Plaintiff also contends that even assuming arguendo the assignment to have been properly executed and delivered by Bland it would not have been valid as being in violation of § 17–36.70, W.S.1957, requiring consent of the shareholders when there is a transfer not made in the usual and regular course of business of all or substantially all of the property or assets of a corporation. Even should we agree that the assignment was not made in the regular course of business, the argument is not pointed up inasmuch as there is no showing that the farmout did constitute all of the assets of the Bland company and there is even evidence to the contrary. Much is made by plaintiff of the fact of intercorporate deals where some of the officers are common to each corporation, and it is conceded by the Dunham group's counsel that a corporate officer cannot without the corporation's knowledge or consent represent it in a transaction with another corporation which has an opposing interest or in which he is interested as a director or other officer. However, they emphasize that this rule is peculiarly applicable to transactions between the corporation and other entities in which interlocking stockholders, directors, officers, or principals are involved and following dubious transactions between the entities suits are brought by the stockholders or other interested parties to set aside the transactions. As a practical matter, the Dunham group points out that eventually Bland, his wife, and Debco, assigned all their interest in the subject matter of this suit to the Bland company (in which Tipps and Tempel then owned all the stock) so there can be little question but that this case does not in any way affect the validity of the Bland and the Bland company assignment to Debco, the rights of innocent third parties being involved.

Despite insinuations to the contrary, we find no evidence in the record tending to show that the Dunham group either knew or should from the circumstances have known that Bland was acting improperly in executing the agreement of May 26. Nichols of the Dunham group testified that Bland told him Bland company was his company, that he was president and his wife secretary, and that as far as Debco was concerned he had set it up to be the production end to separate it from the drilling business. Bland said he was pretty sure he had advised Nichols as to why he had assigned, i. e., because he wanted the production out of the drilling department for tax reasons. Loeffler of American testified that Bland told him he had made the transfer for tax purposes. Admittedly, this testimony is not sufficient to show due care on the part of the Dunham group in ascertaining if an assignment had actually been made, but there is certainly no evidence before the court to show that they were in bad faith.

Closely allied to this aspect of the controversy is plaintiff's censure of the defendants' having failed to inquire as to the authority of Bland to act as he purported to do. Allusion is made by plaintiff to various authorities indicating that the scope of an agent's authority cannot be proven merely by the agent's acts or representations and that it is the duty of those who deal with him to inquire as to the extent of his authority. The general tenor of many of the authorities thus cited is, however, to the effect that it is the duty of the person dealing with the agent to exercise care *where circumstances indicate that the agent may be acting in fraud of the principal.* Here the circumstances were actually the reverse. The Bland company itself had placed Bland in a position which would bespeak entire authority. Bland and his wife were a majority of the directors, Bland was president of the company, which

used his name, he had the authority to write the checks, and in fact, was the only person to whom anyone in the community would have ordinarily gone to deal with the company. Additionally, Bland's option to buy out the other stockholders was effective during this period. The rule of law is as contended, but its application is improper here.

In fine, although in the absence of proper assignment from the Bland company to Debco, title in the Dunham group was not beyond question, we find substantial legal basis for the trial court to have arrived at the judgment as it relates to American and to Dunham, and we perceive no valid reason why it should not stand.

### Waiver by American

■ It is the contention of plaintiff that Bland had not furnished evidence of financial responsibility and of insurance coverage but was nevertheless permitted to move on to the lease for the drilling of the first well and despite certain protestations of American's representatives also moved the rig to the location of the second well without remonstrance and restraint and commenced drilling the second well on May 23, 1964. Plaintiff maintains this constituted a waiver of American's right to later insist upon compliance. In exploring the merit of this assertion, it is immediately obvious that with the surrounding circumstances as complicated as they were a determination of American's failure to stop Bland from drilling the second well as a waiver can be no pro forma conclusion. There was no express statement of American which could be interpreted to bear out plaintiff's contention. However, plaintiff sets much store by the May 17 memorandum of American to Bland and the Bland company, " * * * we do not wish to hinder your operations and your possibility to demonstrate financial capability. Hence we insist on making sure that your expenses on each well are kept absolutely current and paid before the next well is commenced." Loeffler, American's represent-

ative, testified that the memorandum was issued because American wanted "no misunderstanding as to what our intentions were concerning the fact that we wouldn't permit him [Bland] to go along with the drilling, because he hadn't complied with the financial requirement." The witness went on to say that Bland telephoned on May 24 and said that Ted F. Dunham wanted back in and although in that conversation Bland indicated he did not want Dunham back, Nichols, the Dunham group's representative, began paying some of Bland's bills and before May 27 called causing Loeffler to assume that Bland's and Dunham's differences had been ironed out. This evidence would seem to show American to have been willing for Bland to continue if he was properly financed but not otherwise and falls short of disclosing the required intention to waive. Flygare v. Brundage, 76 Wyo. 350, 302 P.2d 759, 764. The evidence is clear that the Bland company was not in a financial position to carry out the provisions of the farmout and so far as the record reflects the oil field would have remained undeveloped without financing by someone. It is worthy of remark here that the trial court's decision specifically avoided decreeing a default of the Bland company so as to deprive it of all rights in the entire lease and to all formations. In other words, plaintiff under the judgment has all the rights it would have had had the farmout been completed less the cost of financing, the finder's portion and that of the lawyers, all of which the trial court recognized as essential to the field's development.

In discussing the May 26, 1964, agreement, we have covered points 5 and 6, and see no occasion to here canvass plaintiff's 7, 8, and 9.

### Assignments to Mahoney, et al.

■ Plaintiff, noting that Mahoney and Murphy base their claim of interest on an assignment dated June 1, 1964, which Murphy was supposed to have prepared, the assignors being "Ed" Bland Drilling Com-

pany and Ed Bland, insists that this immediately raises the question as to who the parties to the transaction really were and that for all plaintiff knows D. E. Bland may have several other corporations or partnerships with similar variations in his name, one of which may be Ed Bland Drilling Company. Plaintiff says this along with the fact that no corporate seal appears and there is no attestation by a corporate secretary can lead only to the assumption that the assignment was made by some stranger to the title. Additionally, plaintiff argues that by no stretch of the imagination can it be shown that the Bland company received consideration for an interest of such tremendous value, and again refers to the necessity for corporate approval of any such sale and the duty of a party dealing with a corporate officer to ascertain the extent of that officer's authority.

Concerning plaintiff's assumption that the assignment was made by some stranger to the title, the operating agreement referred to in the trial court's judgment, dated the same day as the farmout, and mentioned therein as an attachment, read, "This Operating Agreement made and entered into * * * by and between American * * * and Ed Bland and *Ed* Bland Drilling Company, a corporation organized and existing under and by virtue of the laws of Wyoming, P. O. Box 1153,

Casper, Wyoming, both of whom will be hereinafter referred to as * * * 'Bland' * * *." (Emphasis supplied.) The fact that the contracting parties in the operating agreement used "Ed" Bland Drilling Company, as did the assignment to Murphy and Mahoney, leaves plaintiff's argument on this point without force. The trial court seemingly arrived at its judgment by relying substantially on equitable rather than strictly legal principles, and under all the circumstances here present, we cannot disagree with the trial court's result.

■ Plaintiff insists that the Stevens' assignment is even less acceptable than the one to Murphy and Mahoney since it recites first of all that it was granted in consideration of certain services rendered by Stevens to Bland and the assignment is signed solely by Bland. We cannot say the trial court was in error in determining that assignment to be within the apparent authority of Bland and in the furtherance of company purposes.

In contemplating the entire litigation, we note a lack of proof as to the value of the Dunham group's financing as well as of the lawyers' and finder's services, but this matter was not really in issue either in the trial or the appeal, and we think establishment of the value was the obligation of plaintiff.

Affirmed.